employee evening or non-working hours for further aid or treatment of an injury, which will not cause a loss of regular work time, then said employee shall arrange to have all further visits to the doctor scheduled for non-working hours.

## ARTICLE XII
### INDUSTRY COMMITTEE

The parties hereto agree that it is in the mutual interest of those engaged in the plumbing industry to have a formal mechanism to deal with issues which concern the industry and which affect the interests of the Employers and Union and employees represented by the Union who are parties to, bound by or covered by this Agreement. Therefore, the parties hereto agree to establish an All Industry Committee to meet, discuss and deal with such issues. Said Committee shall be composed of the President of the Plumbing Contractors Association of Chicago and Cook County; three (3) members appointed by the President of the Contractors Association who shall be Employers and who shall serve in an advisory capacity to the Plumbing Council of Chicagoland, Inc.; the Union's Business Manager, and three (3) members appointed by the Business Manager from among the officers of the Union. Co-Chairmen shall be elected (one Labor and one Management) from the designated members of the Committee. The Committee shall meet from time to time as determined by the Co-Chairmen. All meeting expenses and costs shall be shared equally by the Contractors Association and the Union. The expenses and costs incurred by either the Contractors Association or the Union in connection with any action or undertaking by those respective parties related to or arising out of any matter considered by the Committee shall be borne by the party taking such action.

## ARTICLE XIII
### JURISDICTIONAL DISPUTES

The Employer and Union agree that in the event of any jurisdictional dispute between the Union and another labor organization bound by the Standard Agreement establishing the Joint Conference Board of the Construction Employers' Association and the Chicago and Cook County Building Trades Council with respect to any work at or related to any work or project within Cook County, Illinois at which the Employer is engaged or is to be engaged as a contractor or a subcontractor or to perform any work, said dispute shall be submitted to said Joint Conference Board for final and binding resolution pursuant to said Standard Agreement and the Board's procedures thereunder. The Employer and Union agree to be bound by the procedures and decision of the Joint Conference Board with respect to any such dispute in accordance with said procedures.

38

## ARTICLE XIV
### SUCCESSORS AND ASSIGNS

SECTION 14.1. Employer Entities Bound. This Agreement is binding upon the Employer regardless of whether he or it changes the name or address of his or its business and upon any other business entity within the trade and territorial jurisdiction of the Union which is owned, managed, controlled and/or operated by the Employer or its principals or any of them. This paragraph is intended to apply to the scope of work covered by this Agreement and shall not be construed as adding to the scope of such work.

SECTION 14.2. Successors and Assigns. This Agreement shall be equally binding on the Employer and its successors and assigns and it is the intent of the parties that this Agreement shall remain in effect for its full term and bind the successors of the respective parties. In furtherance of this intent, it is agreed that in the event of any sale, merger, acquisition, consolidation or any other transfer of the Employer's business, the Employer shall make it a condition of such transfer and the agreement by which any such transfer is accomplished shall provide that the transferee shall be bound by the terms of this Agreement. The Employer shall give the Union written notice of any such transfer at least ten (10) days prior to the closing date thereof and specifically advise the Union in said notice that the provisions of this Article have been complied with.

## ARTICLE XV
### ANNUAL REOPENERS

ARTICLE XV HAS BEEN INTENTIONALLY LEFT BLANK

## ARTICLE XVI
### MISCELLANEOUS

SECTION 16.1. Separable Provisions. Each and every clause of this Agreement shall be deemed separable from each and every other clause of this Agreement to the end that in the event that any clause or clauses shall be specifically and finally determined to be in violation of any Illinois or federal law, then in such event such clause or clauses only, to the extent only that any may be so in violation, shall be deemed of no force and effect and unenforceable upon written notice of such invalidity from one party to the other, without such invalidity impairing the validity and enforceability of the rest of the Agreement including any and all provisions in the remainder of any clause, sentence or paragraph in which the language determined to be invalid may appear. In the event of such invalidity and notice thereof, the parties shall meet promptly at

39

the request of either party to negotiate mutually acceptable substitute language. If the parties are unable to agree on such substitute language, either party shall be permitted to exercise all legal and lawful economic recourse in support of its demands notwithstanding any provisions of this Agreement to the contrary.

**SECTION 16.2. Duration of Agreement.** The collective bargaining agreement between the Chicago Journeymen Plumbers' Local 130, U.A. and the Plumbing Contractors Association of Chicago and Cook County shall be in effect between June 1, 2004 and May 31, 2007, and thereafter for successive yearly periods, unless written notice to terminate or with its intention to modify the Agreement is received, by certified mail – return receipt requested, no more than ninety (90) days but no less than sixty (60) days prior to the expiration date of any such then current collective bargaining agreement.

## ARTICLE XVII
## SERVICE & MAINTENANCE AGREEMENT

The Agreement recognizes that there exists a Plumbing Service & Maintenance Area agreement, the Chicago Journeymen Plumbers' Local Union 130, U.A. Service & Maintenance Agreement. Whenever the terms of this Agreement shall conflict with the terms of the Service & Maintenance Agreement, the terms of the Service & Maintenance Agreement shall control.

This Agreement is hereby executed as of the 1st day of June 2004 at Chicago, Illinois.

PLUMBING CONTRACTORS ASSOCIATION OF
CHICAGO AND COOK COUNTY

George W. Treutelaar          Lori Abbott
Chairman of Labor Relations Committee          Labor Relations Committee

Robert Meiko          Walter A. Brongiel
Labor Relations Committee          Labor Relations Committee

Craig Campeglia
Labor Relations Committee

CHICAGO JOURNEYMEN PLUMBERS'
LOCAL UNION 130, U.A.

James T. Sullivan          James F. Coyne
Business Manager          Secretary-Treasurer

Robert F. Walsh
Recording Secretary

# APPENDIX A
# OCCUPATIONAL JURISDICTION

The following shall constitute the occupational jurisdiction of work of the Union:

1. All piping for plumbing, water, waste, floor drains, drain grates, supply, leader, soil pipe, grease traps, sewage and vent lines.

2. All piping for water filters, water softeners, water meters and setting of same.

3. All cold, hot and circulating water lines, piping for house pumps, cellar drainers, ejectors, house tanks, pressure tanks, swimming pools, ornamental pools, display fountains, drinking fountains, aquariums, plumbing fixtures and appliances and the handling and setting of the above-mentioned equipment.

4. All water services from mains to buildings, including water meters and water meter foundations.

5. All water mains from whatever source, including branches and fire hydrants, etc.

6. All down spouts and drainage areas, soil pipe, catch basins, manholes, drains, gravel basins, storm sewers, septic tanks, cesspools, water storage tanks, etc.

7. All liquid soap piping, liquid soap tanks, soap valves, and equipment in bath and washrooms, shower stalls, etc.

8. All bathroom, toilet room and shower room accessories, i.e., as towel racks, paper holders, glass shelves, hooks, mirrors, cabinets, etc.

9. All lawn sprinkler work, including piping, fittings and lawn sprinkler heads.

10. All sheet lead lining for X-ray rooms, fountains, swimming pools or shower stalls, tanks or vats for all purposes and for roof flanges in connection with the pipe fitting industry.

11. All fire stand pipes, fire pumps, pressure and storage tanks, valves, hose racks, fire hose cabinets and accessories and all piping for sprinkler work of every description.

12. All block tin coils, carbonic gas piping, for soda fountains and bars, etc.

13. All piping for railing work, and racks of every description, whether screwed or welded.

14. All piping for pneumatic vacuum cleaning systems of every description.

15. All piping for hydraulic, vacuum, pneumatic, air, water, steam, oil, or gas, used in connection with railway cars, railway motor cars, and railway locomotives.

EXHIBIT No. _____
PAGE _____ OF _____
Exhibit A, Page 52 of 85

16. All marine piping, and all piping used in connection with ship building and ship yards.
17. All power plant piping of every description.
18. The handling, assembling and erecting of all economizers and super-heaters, regardless of the mode or method of making joints, hangers and erection of same.
19. All internal and external piping on boilers, heaters, tanks and evaporators, water legs, water backs and water grates, boiler compound equipment, etc.
20. All soot blowers and soot collecting piping systems.
21. The setting, erecting and piping, for all smoke consuming and smoke washing and regulating devices.
22. The setting, erecting and piping of instruments, measuring devices, thermostatic controls, gauge boards, and other controls used in connection with power, heating, refrigerating, air conditioning, manufacturing, mining and industrial work.
23. The setting and erecting of all boiler feeders, water heaters, filters, water softeners, purifiers, condensate equipment, pumps, condensers, coolers, and all piping for same in power houses, distributing and boosting stations, refrigeration, bottling, distilling and brewing plants, heating, ventilating and air conditioning systems.
24. All piping for artificial gases, natural gases and holders and equipment for same, chemicals, minerals and by-products and refining of same, for any and all purposes.
25. The setting and erecting of all under-feed stokers, fuel burners, and piping, including gas, oil, power fuel, hot and cold air piping and accessories and parts of burners and stokers, etc.
26. All ash collecting and conveyor piping systems, including all air washing and dust collecting piping and equipment, accessories and appurtenances and regulating devices, etc.
27. The setting and erection of all oil heaters, oil coolers, storage and distribution tanks, transfer pumps, and mixing devices, and piping thereto of every description.
28. The setting and erecting of all cooling units, pumps, reclaiming systems and appurtenances, in connection with transformers, and piping to switches of every description.
29. All fire extinguishing systems and piping: whether by water, steam, gas or chemical, fire alarm piping, and control tubing, etc.
30. All piping for sterilizing, chemical treatment, deodorizing and all cleaning systems of every description and laundries for all purposes.
31. All piping for oil or gasoline tanks, gravity and pressure lubricating and greasing systems, air and hydraulic lifts, etc.

42

32. All piping for power, or heating purposes, either by water, air, steam, gas, oil, chemicals or any other method.
33. All piping, setting and hanging of all units and fixtures for air conditioning, cooling, heating, roof cooling, refrigerating, ice-making, humidifying, dehumidifying, dehydrating, by any method, and the cleaning and testing, servicing of all work after completion.
34. All pneumatic tube work, and all piping for carrying systems by vacuum, compressed air, steam, water, or any other method.
35. All piping to stoves, fire grates, blast and heating furnaces, ovens, driers, heaters, oil burners, stokers and boilers and cooking utensils, etc. of every description.
36. All piping in connection with central distribution filtration treatment stations, boosting stations, waste and sewage disposal plants, central chlorination and chemical treatment work, and all underground supply lines to cooling wells, suction basins, filter basins, settling basins, and aeration basins.
37. All process piping for refining, manufacturing, industrial and shipping purposes, of every character and description.
38. All air piping of every description.
39. All temporary piping of every description in connection with building and construction work, excavating and underground construction.
40. The laying out and cutting of all holes, chases and channels, the setting and erection of bolts, inserts, stands, brackets, supports, sleeves, thimbles, hangers, conduits and boxes used in connection with the pipe fitting industry.
41. The handling and setting of boilers, setting of fronts, setting of soot blowers, and attaching of all boiler trimmings.
42. All pipe transportation lines for gas, oil, gasoline, fluids and liquids, water aqueducts, and water lines and booster stations of every description.
43. All acetylene and arc welding, brazing, lead burning, soldered and wiped joints, caulked joints, expanded joints, rolled joints or any other mode or method of making joints in connection with the pipefitting industry.
44. Laying out, cutting, bending and fabricating of all pipe work of every description, by whatever mode or method.
45. All methods of stress relieving of all pipe joints made by every mode or method.
46. The assembling and erecting of tanks used for mechanical, manufacturing or industrial purposes, to be assembled with bolts, packed or welded joints.
47. The handling and using of all tools and equipment that may be necessary for the erection and installation of all work and materials used in the pipefitting industry.

43

EXHIBIT NO. ____
PAGE ____ OF ____

48. The operation, maintenance, repairing, servicing and dismantling of all work installed by journeymen under this Agreement.

49. All piping for cataracts, cascades, i.e., (artificial water falls), make-up water fountains, captured waters, water towers, cooling towers, and spray ponds, used for industrial, manufacturing, commercial, or any other purpose.

50. Piping herein specified means pipe made from metals, tile, glass, rubber, plastic, wood, or any other kind of material or product manufactured into pipe, usable in the pipe fitting industry, regardless of size or shape.

51. The installation and testing of backflow preventors.

## APPENDIX B
### FLEXIBLE WORK DAY AND WORK WEEK

Except as specifically permitted under the following provisions of this Appendix B governing flexible work days and the flexible work week, employees covered by the Agreement to which this Appendix B is attached shall work the standard work day and standard work week at the straight time rates and be paid for overtime work at the overtime rates as provided in Section 5.2 of the Agreement.

1. Only Employers who employ apprentice plumbers may be permitted to utilize a flexible work day or a flexible work week. An adequate quantity of competent apprentices are available through the Joint Apprenticeship Committee.

2. The flexible work day and flexible work week are not permitted for any work done on a contract basis. They are permitted only under the terms further specified hereinbelow for residential, commercial or industrial jobbing repair and/or service work billed to the customer on an hourly basis.

3. No employee may be scheduled for or required to work more than eight (8) flexible hours in any work week.

4. The flexible work day, Monday through Friday, consists of up to eight (8) consecutive hours between 6:00 a.m. and 8:30 p.m., exclusive of a one-half (1/2) hour unpaid meal break to be taken no later than five (5) hours after the employee's starting time; provided, however, that in no event may such a flexible work day start later than 12:00 p.m. (noon). The pay rate for flexible hours worked before the regular starting time for the Employer's shop (i.e. 6:00 a.m. or 9:00 a.m.) and after the regular quitting time (i.e. 2:30 p.m. or 5:30 p.m.) shall be the regular straight time hourly rate plus fifteen percent (15%). All hours worked on such days in excess of eight (8) hours shall be paid at one and one-half (1-1/2) times the regular straight time hourly rate.

5. Eligible Employers may schedule Saturdays as a regular fifth (5th) flexible work day in any work week for jobbing repair and/or service work. In such cases, the Saturday flexible work day shall consist of the hours between 8:00 a.m. and 4:30 p.m., exclusive of a one-half (1/2) hour unpaid lunch break taken no later than five (5) hours after the starting time. Employees who are required to work Saturdays as a flexible fifth

44

45

EXHIBIT No.

PAGE    OF

Exhibit A, Page 54 of 85

46

(5th) work day and who are required to perform residential jobbing repair and/or service work in a residential building of no more than three (3) stories on such day shall be paid at their regular straight time hourly rate for such fifth (5th) day for such work between the hours of 8:00 a.m. and 4:30 p.m. Employees who are required to perform any commercial or industrial jobbing repair and/or service work or to perform jobbing repair and/or service work in a residential structure of more than three (3) stories during such hours on Saturdays shall be paid at their regular straight time hourly rate plus fifteen percent (15%) for all such hours. All jobbing repair and/or service work performed on such Saturdays before 8:00 a.m. or after 4:30 p.m. shall be paid for at one and one-half (1-1/2) times the regular hourly rate. Such Saturdays cannot be used as a make-up day. All work for which flexible time is permitted by this Appendix "B" to be performed on Sunday or a legal holiday identified as such in the Agreement shall be paid at double time.

# APPENDIX C
## WAGE RATES AND FRINGE BENEFITS AND PAYROLL DEDUCTIONS

The following wage rates and fringe benefit contributions per hour payroll deductions shall be in effect as of June 1, 2004 through May 31, 2005.

### PAYROLL DEDUCTIONS

| | Wages | Welfare | Pension | Education | Promotion Service | 401k or Retirement Working Plan | Local Supplemental Dues |
|---|---|---|---|---|---|---|---|
| Journeymen | $37.10 | 6.25 | 3.44 | .64 | .49 | 1.50 | .32 |
| Sub-Foremen | $38.35 | 6.25 | 3.44 | .64 | .49 | 1.50 | .32 |
| Foremen and Inspectors (supervising four or more men) | $39.10 | 6.25 | 3.44 | .64 | .49 | 1.50 | .32 |
| Superintendents or District Foremen (supervising 19 or more men) | $40.10 | 6.25 | 3.44 | .64 | .49 | 1.50 | .32 |
| General Superintendents or District Superintendents | ** | 6.25 | 3.44 | .64 | .49 | 1.50 | .32 |

**at least 6% above Superintendent's wage rate per hour

| Apprentices | Wages | Welfare | Pension | Education | Promotion Service | 401k or Retirement Working Plan | Local Supplemental Dues |
|---|---|---|---|---|---|---|---|
| (1st six months) | 12.60 | 6.25 | 3.44 | .64 | .44 | N/A | N/A |
| (2nd six months) | 13.75 | 6.25 | 3.44 | .64 | .44 | N/A | .23 |
| 2nd Year | 16.30 | 6.25 | 3.44 | .64 | .44 | N/A | .23 |
| 3rd Year | 18.55 | 6.25 | 3.44 | .64 | .44 | N/A | .23 |
| 4th Year | 24.50 | 6.25 | 3.44 | .64 | .44 | 1.00 | .23 |
| 5th Year | 27.85 | 6.25 | 3.44 | .64 | .44 | 1.00 | .23 |

*Includes $0.05 per hour Direct Contribution to the U.A. Training Fund

Wage increases of $2.80 per hour effective June 1, 2006 and $3.00 per hour effective June 1, 2006 have been negotiated under the terms of this Agreement for Journeymen Plumbers. Apprentice wage increases effective June 1, 2005 and June 1, 2006 will be determined on the same percentage as the Journeymen rate. An apprentice with a minimum of 4½ years credit who has successfully obtained the City of Chicago or State of Illinois plumbers license test shall be paid the then current journeymen rate. These increases for journeymen and apprentices are to be allocated in a manner to be determined by Chicago Journeymen Plumbers' Local Union 130, U.A. in its sole and exclusive discretion. Local 130 will timely notify each signatory Employer of its determination concerning the allocation.

47

EXHIBIT No._____

Exhibit A, Page 55 of 85

# IMPORTANT INFORMATION

## PLUMBERS' RETIREMENT SAVINGS FUND (401(k) PLAN) AND SAVINGS PLAN

**PLUMBERS' RETIREMENT SAVINGS FUND (401(k) PLAN):**

The Employer shall deduct from the wages (before taxes) of each journeyman plumber enrolled in the 401(k) Plan a minimum of one dollar and fifty cents ($1.50) per each hour worked for the Plumbers' Retirement Savings Fund (401(k) Plan). The Employer shall deduct from the wages (before taxes) of each Fourth and Fifth year Apprentice enrolled in the 401(k) Plan a minimum of one dollar (1.00) per each hour worked for the Plumbers Retirement Savings Fund (401(k) Plan). First, Second and Third year Apprentices are not included in this Plan.

### REGULAR SAVINGS PLAN:

The Employer shall deduct from the wages (after taxes) of each journeyman plumber not enrolled in the 401(k) plan a minimum of one dollar and fifty cents ($1.50) per each hour worked for the Savings Plan. The Employer shall deduct from the wages (after taxes) of each Fourth year and Fifth year Apprentice not enrolled in the 401(k) plan a minimum of one dollar ($1.00) per each hour worked for the Savings plan. First, Second and Third year Apprentices are not included in this Plan.

### WORKING DUES:

The Employer shall deduct (after taxes) thirty-two cents ($0.32) per hour for each hour worked for each Journeyman, Foreman, Superintendent and General Superintendent, and twenty-three cents ($0.23) per each hour worked for each Apprentice, with the exception of first year-first six months Apprentices for Working Dues.

### IMPORTANT NOTE

**PLUMBERS' RETIREMENT SAVINGS FUND (401(k) PLAN)**

A participant can direct more than the base contributions rate of $1.50 per hour, in increments of ($0.50) fifty cents, but not more than $8.00 per hour to the 401(k) Plan not to exceed the IRS limits.

### PLUMBERS' SAVINGS PLAN

An employee, in cooperation with his/her Employer, has the following options:

1) An employee not participating in the 401(k) Plan can allocate more than $1.50 per hour, in increments of fifty cents ($0.50), to the Plumbers' Savings Plan.

2) An employee in the 401(k) Plan can allocate at least $1.50 per hour or more, in fifty cents ($0.50) increments, to the Plumbers' Savings Plan, in addition to amounts contributed to the employee's 401(k) Plan.

48

# APPENDIX D
# ALCOHOL AND DRUG PROGRAM

The ALCOHOL AND DRUG PROGRAM appendix was made entered into as of the 1st day of June, 1992, by and between CHICAGO JOURNEYMEN PLUMBERS' LOCAL UNION 130, U.A. (hereinafter referred to as the "Union"), and the PLUMBING CONTRACTORS ASSOCIATION OF CHICAGO AND COOK COUNTY on behalf of itself and its member contractors (hereinafter, for convenience, collectively referred to as the "Employer" or "Employers") for the purpose of supplementing the parties' current collective bargaining agreement having a term of June 1, 1995 thorough May 31, 1998 (hereinafter referred to as the "Agreement") and all successor contracts for their entire terms as well.

## WITNESSETH:

WHEREAS, the Employer has agreed, pursuant to Article IV of the Agreement, to make all reasonable provisions for the safety and health of its employees during the hours of their employment, and

WHEREAS, the Union has agreed, pursuant to Article IV of the Agreement, to promote in every way possible the realization of the responsibility of the individual employee with regard to preventing accidents to himself and to his fellow employees during the hours of their employment; and

WHEREAS, the Employer and Union believe that alcohol and drug use by employees covered under the parties' Agreement endanger the safety and health of such employees, their co-workers, other trades people and the public generally; and

WHEREAS, in order to fulfill their respective agreements under said Article IV, the Employer and Union are committed to the principle of an alcohol and drug free work place and to the establishment of fair, appropriate, practical and effective rules and procedures for maintaining same; and

NOW, THEREFORE, the Employer and the Union hereby agree as follows:

49

No. ___ PAGE ___ OF ___

Exhibit A, Page 56 of 85

# I. PURPOSE AND SCOPE OF APPENDIX

A. The purposes of this Appendix are to establish rules and procedures governing (1) the testing of applicants for drug use as a condition of their initial employment with any Employer under the Agreement; (2) the testing of employees covered by the Agreement where there is reasonable suspicion to believe that such employees are using or are impaired by alcohol or drugs during working hours or on the premises of an Employer; and (3) the discipline of such employees who possess, dispense, receive, use or are impaired by alcohol or drugs during working hours or on such premises.

B. An Employer shall have no right to impose on any applicant or employee any testing, disciplinary actions or other measures relating to alcohol or drugs, except in accordance with this Appendix.

C. The sole exception to the foregoing shall be the temporary, limited right of an Employer to adopt an alcohol and drug program required by a customer as a condition to securing and satisfying a given contract. This right shall be limited to the life of the applicable contract or project. In each such case, the Employer shall promptly advise the Union of the requirement that it adopt such a program, and shall provide the Union and the employees assigned to the project with a copy of the program.

D. The Employer and the Union agree to ensure that a copy of this Appendix is promptly provided to all Employers bound by the Agreement and that all employees and applicants are informed of the provisions hereof.

# II. INTERPRETATION OF APPENDIX, AND RESOLUTION OF DISPUTES CONCERNING EMPLOYEES

A. The Employer and the Union acknowledge that questions, disagreements and disputes may arise from time to time concerning interpretation of this Appendix and compliance by the parties with the provisions hereof as concerns employees. In all such cases, representatives of the Employer and the Union shall meet and confer within ten (10) working days following written notice by one party to the other of the existence of any such question, disagreement or dispute.

B. If the Employer and the Union are unable to resolve such question, disagreement or dispute pursuant to such conference, the Employer or the Union may submit the matter to the Joint Arbitration Board (JAB) for disposition in accordance with Sections 3.4, 3.5, and 3.6 of Article III of the Agreement. The decision of the JAB shall be final and binding upon the Employer, the Union and the employee.

C. The provisions of this Clause II of this Appendix shall not be applicable to applicants rejected for initial employment under the provision of Clause VII hereof. However, it shall be a violation of this Appendix for any Employer to put any applicant to work in a bargaining unit position under the Agreement unless such applicant has taken the drug test and tested negative as provided for under Clause VII hereof. The Union or any other Employer may complain of such violation to the JAB pursuant to Section 3.4 of the Agreement. The JAB shall hear and resolve the complaint pursuant to Sections 3.4, 3.5, and 3.6 of the Agreement. The decision of the JAB shall be final and binding on the Union and all Employers who are parties to the dispute. The JAB shall have the authority in such disputes, without limitation, to order that an Employer found guilty of violating this Paragraph C to withdraw any conditional offer of employment made to the applicant, discharge the applicant, cease and desist from employing the applicant under the Agreement, to fine the Employer and/or to enter such other order as it deems appropriate.

# III. DEFINITIONS

As used in this Appendix, the following terms shall have the meanings stated:

A. "Applicant" - an individual who has applied for or who is seeking initial employment in any bargaining unit position with any Employer bound by the Agreement. "Applicant" does not include an individual who has held such initial employment with an Employer under the Agreement or under prior collective bargaining agreement between an Employer and the Union but who thereafter applies for or seeks a bargaining unit position with the same or another Employer under the Agreement.

B. "Employee" - An individual who is employed by an Employer in a bargaining unit position under the Agreement or who previously has been employed in such position by an Employer under the Agreement or under a prior collective bargaining agreement between an Employer and the Union.

C. "Employer's premises" - The Employer's offices, shops, parking lots and other facilities and grounds, the Employer's vehicles and equipment, and other work sites, buildings, facilities and grounds entered upon by the employee in connection with his job duties.

50

51

EXHIBIT
PAGE    0E

52

D. "Alcohol" - Any liquid or solid which contains any amount or percentage of any alcohol, as chemically defined, with the exception of commercial products used in the plumbing trade.

E. "Drugs" - Any substance within the general classes of drugs commonly described as amphetamines, barbiturates, benzidiazepines, cocaine, marijuana/hashish, methadone, methaqualone, opiates, phencyclidine (PCP), and propoxyphene.

F. "Reasonable Suspicion" - A belief based upon observations which reasonably lead the Employer or its agent to suspect that an employee is in possession of, dispensing, receiving, using or impaired by alcohol or drugs during working hours or while on the Employer's premises.

## IV. PROHIBITED EMPLOYEE CONDUCT AND DISCIPLINE

A. In order to protect the safety and health of all employees, their coworkers, other tradesmen and the general public, EMPLOYEES SHALL NOT POSSESS, DISPENSE, RECEIVE, USE OR BE IMPAIRED BY ALCOHOL OR DRUGS AT ANY TIME DURING WORKING HOURS OR WHILE ON THE EMPLOYER'S PREMISES.

B. The conduct described below shall constitute a violation of the foregoing policy. Any violation of these rules by an employee shall be grounds for immediate discharge:

(1) Possession, dispensing or receiving alcohol or drugs during working hours or while on the Employer's premises;

(2) Using or being impaired by alcohol or drugs during working hours or while on the Employer's premises;

(3) Refusing to cooperate fully in an inspection conducted by an Employer of its property to determine the presence of alcohol or drugs;

(4) Refusing, for a second time, to submit to reasonable suspicion testing requested by the same Employer, including a refusal to sign required consent and chain of custody forms; and

(5) Refusing to submit to testing requested by an Employer or testing positive for alcohol or drugs at any time within one (1) year after enrollment in a legitimate, supervised alcohol or drug rehabilitation program.

## V. PRESCRIBED MEDICATION

A. Any employee who is using a prescribed or "over the counter" medication should so advise his Employer, where the employee has been informed of his physician or pharmacist that the medication may have impairing effects.

B. Where so advised, an Employer shall determine whether the employee's continuation of his existing job duties would present an undue risk of injury to the employee, his co-workers or others at the work site. Where it is determined that such a risk would be presented, the Employer may reassign the employee to an appropriate other work site or task.

## VI. TESTING OF EMPLOYEES

A. Where an Employer has a reasonable suspicion that an employee is using or is impaired by alcohol or drugs during working hours or while on the Employer's premises, the Employer shall have the right to request that the employee submit to urinalysis testing for alcohol and drugs.

B. Wherever reasonably possible, the Employer's observation shall be summarized in writing and signed by each of the observants.

C. An employee shall have the right, once during his employment by the same Employer, to refuse his Employer's request that he submit to such testing. In such event, the employee shall be suspended, without pay for the balance of that workday as well as the next, and such discipline shall not be grievable.

D. Whenever an employee is to be tested, the employee shall be provided with transportation to and from the collection facility. The Employer shall advise the Union of the name and address of the collection facility to which the employee will be sent and the approximate time that the employee will be reporting there. The Union shall dispatch an Officer, Business Representative or other agent, if available, to the collection facility. No specimen shall be collected from the employee without such Union agent being present unless any such agent is unavailable or is unreasonably detained.

E. The employee shall be permitted to give the specimen in private, subject to the right of a representative of the Employer, the Union and the collection facility to remain immediately outside the stall or other area where the specimen is given, to the extent permitted by the collection facility.

F. The Employer shall pay the employee for the time required to give the specimen, including travel to and from the collection facility, and shall bear all costs relating to any testing which it requests.

G. All testing conducted pursuant to this Appendix shall be performed by laboratories certified by the U.S. Department of Health and Human Services

53

EXHIBIT NO.
PAGE
Exhibit A, Page 58 of 85

(HHS) to perform urinalysis testing for federal agencies. Additionally, all collection facilities and laboratories selected for such testing shall comply with all applicable HHS or National Institute on Drug Abuse (NIDA) guidelines and protocols, except as superseded by this Appendix.

H. The suspected presence of alcohol and drugs shall initially be tested by the EMIT methodology. Presumptive positive results for drugs shall be confirmed by the GC/MS methodology. Presumptive positive results for alcohol shall be confirmed by the GC methodology. Laboratory test results shall be deemed positive if they meet or exceed the cut-off levels established by NIDA or by the laboratory in accordance with industry standards. Laboratory test results shall be reviewed by a medical review officer (MRO) recommended by the medical care provider associated with the laboratory. The MRO shall issue a test report. If the MRO concludes that a test result is negative because the parent positive laboratory test and that the reason for that laboratory test result is consistent with legal drug use, the MRO shall report the test result as being negative for such reason but shall not identify the drug(s) which were confirmed as positive by the laboratory tests or otherwise comment on the results of such tests. A negative MRO report shall be deemed a negative test result for all purposes under this Appendix.

I. The Employer shall be responsible for selecting and making its own arrangements with one or more medical care providers with respect to collection facilities and procedures, laboratories, testing methodologies and MRO reports in accordance with the requirements of this Clause VI, and shall bear all costs relating thereto.

J. All MRO reports relating to testing requested by the Employer shall be submitted to the Employer. Within one (1) business day of the Employer's receipt thereof, the Employer shall transmit a copy of same to the Union if the employee has authorized such disclosure in writing.

K. An employee who submits to testing at the request of this Employer may be temporarily suspended pending the Employer's receipt of the applicable MRO report, where the Employer reasonably believes that the employee's presence on the job during such period would pose a risk to the safety or health of the employee, his co-workers, other tradesmen or the public generally. If the MRO report is negative for both alcohol and drugs, the Employer shall immediately reinstate the employee and pay him back pay for all hours lost due to such suspension.

L. An MRO report which is positive for either alcohol or drugs shall constitute a rebuttable presumption of the employee's impairment during working hours or while on the Employer's premises under this Addendum. In order to

54

overcome said presumption in any proceeding brought by the Union pursuant to this Appendix, the Union and the employee shall have the burden of persuading the JAB by clear and convincing evidence that the MRO report is erroneous.

## VII  TESTING OF APPLICANTS

A. It is a condition of initial employment that all applicants take and pass a pre-employment urinalysis drug test. Such testing shall conform with the procedures and standards specified in Clause VI, Paragraphs G and H.

B. Applicants for plumber apprentice positions who are to be referred for employment to an Employer by Joint Apprenticeship Committee (JAC) shall be sent for such testing by the JAC. All other applicants shall be referred by the Employer to the Union which shall send such applicants for such testing. The costs related to such testing shall be borne by the applicant.

C. The applicant shall fill in and sign such consent and chain of custody forms required by the health care provider as well as such consent and authorization forms required by the Employer and Union or JAC in the case of applicants who are to be referred by the JAC for employment in apprentice plumber positions to authorize such testing and to release the MRO report to the Union, or the JAC in the case of applicants who are to be referred by the JAC for plumber apprentice positions, and the prospective Employer of the applicant. The applicant shall report to the designated collection facility within forty-eight (48) hours after being directed to do so by the Union or the JAC in the case of such applicants for plumber apprentice positions. Failure of an applicant so to report for testing shall constitute a failure to take such test and disqualify the applicant from employment. Neither the consent forms required by the medical care provider nor any information filled in by an applicant or conveyed by an applicant to the medical care provider concerning any medical condition the applicant may have or any lawful drugs the applicant may be taking therefore shall be disclosed to the Union, the JAC or the prospective Employer except as permitted under the circumstances set forth in Clause VIII of this Appendix. The applicant shall be provided with a copy of the MRO report. The MRO report shall be maintained in confidential files by the Union or the JAC and the prospective Employer as required by applicable law and by Clause VIII hereof except to the extent that disclosure thereof is required by law or permitted under the circumstances set forth in Clause VIII.

D. Applicants who test negative for drugs, as defined in Clause VI, Paragraph H, shall be eligible for initial employment. Applicants who test positive for drugs in accordance with such Clause and Paragraph shall be ineligible

55

EXHIBIT

PAGE ____ OF ____

Exhibit A, Page 59 of 85

for such employment, and any conditional offer of such employment made to such applicant shall be withdrawn.

## VIII.  CONFIDENTIALITY

The Employer and the Union, and the JAC in the case of applicants for apprentice plumber positions, shall keep confidential and shall not disclose any documents relating to employee testing or rehabilitation programs, or information contained therein, except as required by law or in connection with any grievance, claim or cause of action brought by or against the Employer, the Union, the JAC, the applicant or the employee or any other person or entity arising from or in any way relating to the subject matters covered by this Appendix. The filing of any such grievance, claim or cause of action shall constitute a waiver by the applicant or employee of the confidentiality of any and all such documents and the release of the Employer, Union, the JAC and any other person or entity from any confidentiality obligations with respect to any and all such documents.

## IX.  LABOR MANAGEMENT
## RELATIONS SUBCOMMITTEE

The parties hereto agree to form a Labor Management Relations Subcommittee composed of three (3) members appointed by the Plumbing Contractors Association ("PCA") and three (3) members appointed by Local 130 ("Union") to revise Appendix D the Alcohol and Drug Program.

The purpose of the Subcommittee shall be to establish a new Alcohol and Drug Program in order to maintain a drug and alcohol-free workplace and to reduce the probability of accidents or incidents related to the use and/or misuse of alcohol and other drugs by employees so that services are delivered safely, efficiently, and effectively.

The Subcommittee shall commence its meetings immediately upon completion of collective bargaining negotiations and shall complete the Revised Alcohol and Drug Program by December 31, 2004.

It is also agreed that the ability to reopen the contract for the sole purpose of funding this program exists.

## X.  CONTINUING APPLICABILITY
## OF AREA AGREEMENT

This Addendum is specifically incorporated in and made part of the Agreement as though set forth in full therein. Each and all of the provisions of the Agreement shall continue in full force and effect for the duration of said agreement, except where specifically superseded by the express terms of this Appendix.

56

57

*NOTES*

EXHIBIT No._____
PAGE____OF

Exhibit A, Page 60 of 85

# AGREEMENT

between

# PLUMBING CONTRACTORS ASSOCIATION

## OF

# CHICAGO and COOK COUNTY



and



# CHICAGO JOURNEYMEN PLUMBERS' LOCAL UNION 130, U.A.

June 1, 2007, through May 31, 2010

EXHIBIT No. A
PAGE ____ OF ____

## TABLE OF CONTENTS

Page

ARTICLE I - RECOGNITION ................................................................ 7
   SECTION 1.1.   Parties to the Agreement .......................................... 7
   SECTION 1.2.   Recognition Clause ................................................... 7
   SECTION 1.3.   Union Shop .............................................................. 8
   SECTION 1.4.   Subcontracting .......................................................... 8
   SECTION 1.5.   Moonlighting ............................................................ 8
   SECTION 1.6.   Access to Premises .................................................... 8
   SECTION 1.7.   Exclusivity ............................................................... 9

ARTICLE II - STRIKES AND LOCKOUTS .............................................. 9
   SECTION 2.1.   Lockouts ................................................................... 9
   SECTION 2.2.   Employee Job Action ................................................. 9

ARTICLE III - DISPUTE RESOLUTION ................................................. 9
   SECTION 3.1.   Grievance Arbitration ................................................ 9
   SECTION 3.2.   Joint Arbitration Board .............................................. 10
   SECTION 3.3.   Audits ..................................................................... 10
   SECTION 3.4.   Other Contract Violations .......................................... 11
   SECTION 3.5.   Hearing ................................................................... 12
   SECTION 3.6.   Powers of the Joint Arbitration Board ......................... 12
   SECTION 3.7.   Indemnification of the
                Joint Arbitration Board ............................................. 13

ARTICLE IV - WORKING CONDITIONS ................................................ 13
   SECTION 4.1.   General Policy .......................................................... 13
   SECTION 4.2.   Reporting Accidents .................................................. 14
   SECTION 4.3.   Employer Insurance ................................................... 14
   SECTION 4.4.   Unsafe Working Conditions ........................................ 14
   SECTION 4.5.   Plumbing Codes ....................................................... 14
   SECTION 4.6.   Older Workers .......................................................... 14
   SECTION 4.7.   Non-Discrimination Policy .......................................... 15
   SECTION 4.8.   Staffing ................................................................... 15
   SECTION 4.9.   Pipe Cutting ............................................................. 15
   SECTION 4.10.  Specifications .......................................................... 16
   SECTION 4.11.  Plumbing Supervision ............................................... 17
   SECTION 4.12.  Rule Violators .......................................................... 17
   SECTION 4.13.  OSHA and HAZCOM Training ..................................... 17
   SECTION 4.14.  OSHA and HAZCOM Violations .................................. 17
   SECTION 4.15.  Automobile Not Required ........................................... 18

EXHIBIT No. _____

PAGE ____ OF ____